

SIGNED this 15th day of September, 2011

_____
Marcia Phillips Parsons
UNITED STATES BANKRUPTCY JUDGE

_____

[This opinion is not intended for publication as the precedential effect is deemed limited.]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re<br><br>    ROY AUSTIN LITTLE and<br>    MARY ALICE LITTLE,<br><br>                    Debtors. | No. 10-50993<br>Chapter 7 |
| TENNESSEE EDUCATION LOTTERY<br>CORPORATION,<br><br>    Plaintiff,<br><br>vs.<br><br>MARY ALICE LITTLE,<br><br>    Defendant. | Adv. Pro. No. 10-5045 |

## M E M O R A N D U M

APPEARANCES:

    William F. McCormick, Esq.            Dean Greer, Esq.
    Post Office Box 20207                      Post Office Box 3708
    Nashville, Tennessee 37202-0207      Kingsport, Tennessee 37664
    *Attorney for Plaintiff*                        *Attorney for Defendant*

**Marcia Phillips Parsons, United States Bankruptcy Judge**. In this adversary proceeding, the plaintiff Tennessee Education Lottery Corporation seeks a determination that the state court judgment it holds against the debtor Mary Alice Little is nondischargeable under 11 U.S.C. § 523(a)(4). Presently pending before the court is the Plaintiff's motion for summary judgment. Because the court concludes, as discussed below, that a genuine issue of material fact exists as to whether the Debtor's failure to remit lottery ticket sale proceeds was reckless, the Plaintiff's motion will be denied. This is a core proceeding. *See* 28 U.S.C. 157(b)(2)(I).

I.

On April 19, 2010, the Debtor and her husband filed for bankruptcy relief under chapter 7, with the Plaintiff timely initiating this adversary proceeding on July 21, 2010. In its complaint, the Plaintiff alleges that prior to the bankruptcy filing, the Debtor as sole proprietor of Holiday Market entered into a Retailer Contract with the Plaintiff on July 20, 2007, to sell lottery tickets. The Plaintiff further alleges that under the Retailer Contract the Debtor was a fiduciary responsible for preserving and accounting for the ticket sale proceeds, that she failed to remit lottery ticket proceeds in the amount of $34,724.34, and that her failure is a defalcation, nondischargeable under § 523(a)(4) of the Bankruptcy Code. In her answer, the Debtor admits that she was a fiduciary under the parties' agreement, but denies a defalcation, stating that her failure to remit was due to the fact that the ticket sale proceeds had been stolen from her. The answer also included a counterclaim under § 522(h) of the Bankruptcy Code for the return of $2,575 that the Plaintiff had garnished from the Debtor's credit union.

On July 6, 2011, the Plaintiff filed the present summary judgment motion, asserting that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. The Plaintiff's motion is accompanied by its Statement of Undisputed Material Facts, along with the deposition transcripts of the Debtor and her husband Roy Little, copies of the parties' Retailer Contract, Retailer Rules and Regulations, City of Elizabethton Police Department Report, Retailer Incident Report, and the affidavits of Hosea Carter and Vicki Updike, employees of the Plaintiff.

The Debtor filed a response in opposition to the Plaintiff's motion supported by her and her husband's affidavits that dispute certain of the matters contained in the Plaintiff's Statement of Undisputed Material Facts. Not in dispute is the state court order granting the Plaintiff summary

2

judgment against the Debtor in the amount of $35,050.62[1] plus prejudgment interest and attorney fees. That order, entered by the Chancery Court for Davidson County, Tennessee on October 13, 2009, recites that judgment is for breach of contract arising out of the Debtor's failure to pay the Plaintiff for lottery tickets due to a theft committed by the Debtor's employee. Accordingly, the only issue before this court is whether the Plaintiff is entitled to summary judgment on its claim that the judgment held by it is nondischargeable as a defalcation under § 523(a)(4) of the Bankruptcy Code.[2]

II.

As set forth in 11 U.S.C. § 523(a)(4), excepted from the discharge of an individual debt is any debt for "defalcation while acting in a fiduciary capacity." Defalcation is not defined in the Code, but the Sixth Circuit has explained that the term includes the misappropriation of, or failure to account for, trust funds held in a fiduciary capacity. *Board of Trustees of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 639 (6th Cir. 2007) (quoting *Capitol Indem. Corp. v. Interstate Agency, Inc. (In re Interstate Agency)*, 760 F.2d 121, 125 (6th Cir. 1985)). In order for a debt to constitute a defalcation under § 523(a)(4) three elements must be present: (1) a pre-existing fiduciary relationship, (2) a breach of that fiduciary relationship, and (3) a resulting loss. *Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963, 970 (6th Cir. 2009) (citing *In re Bucci*, 493 at 639). The plaintiff seeking a determination of nondischargeability must prove each of these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654 (1991).

With respect to the first element, a pre-existing fiduciary relationship, the Debtor concedes

---

[1] The record does not set forth an explanation for the discrepancy between the judgment amount of $35,050.62 and the $34,724.34 amount alleged in the nondischargeability complaint.

[2] In her answer, the Debtor asserts that negligence on the part of Plaintiff's own employees was a major contributing factor to Plaintiff's loss, such that Plaintiff's claim is barred by its own negligence. In its summary judgment motion, the Plaintiff points out that the state court expressly rejected this defense, the judgment order reciting "the parties' contract did not place a duty upon Plaintiff to monitor employees of Defendant nor did the contract place a duty upon Plaintiff to contact Defendant. Rather, the contract places that duty on Defendant." In her response to the Plaintiff's motion, the Debtor agrees "for purposes of the Motion for Summary Judgment that she does not have a defense based on a claim of negligence by [the Plaintiff]."

3

in her memorandum of law that this element is satisfied in the present case. The Supreme Court has instructed that the term is construed more narrowly for § 523(a)(4) purposes than in other contexts; it is limited to express or technical trusts and does not encompass constructive trusts that arise out of the very act of wrongdoing. *In re Patel,* 565 F.3d at 968 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S. Ct. 151 (1934)). In *In re Cooper,* Bankruptcy Judge Richard Stair of this district held that an express trust for purposes of § 523(a)(4) was created between the plaintiff and the seller of Tennessee lottery tickets by virtue of Tennessee Code Annotated § 4-51-120,[3] the parties' Retailer Contract, and the Retailer Rules and Regulations.[4] That action involved the same plaintiff as this proceeding and the same contractual provisions[5] and regulations. *Tenn. Educ.*

---

[3] Tennessee Code Annotated § 4-51-120(a) provides:

All proceeds from the sale of the lottery tickets or shares shall constitute a trust fund until paid to the corporation either directly or through the corporation's authorized collection representative. A lottery retailer and officers of a lottery retailer's business shall have a fiduciary duty to preserve and account for lottery proceeds and lottery retailers shall be personally liable for all proceeds. Proceeds shall include unsold instant tickets received by a lottery retailer and cash proceeds of the sale of any lottery products, net of allowable sales commissions and credit for lottery prizes sold to or paid to winners by lottery retailers. Sales proceeds and unused instant tickets shall be delivered to the corporation or its authorized collection representative upon demand.

[4] Section 2.12(A) of the Retailer Rules and Regulations provides that "[e]ach Retailer and officers of each Retailer shall have a fiduciary duty to preserve and account for all proceeds from the sale of Tickets collected by it and shall be responsible and liable for all such proceeds."

[5] Paragraph 5 of the Retailer Contract entitled "Electronic Funds Transfer" states:

Retailer shall have a fiduciary duty to preserve and to account to the TEL for all proceeds from the sale of lottery Tickets collected by it and shall be responsible for and liable to the TEL for all such proceeds. All proceeds from the sale of lottery Tickets and all other funds due the TEL shall constitute a trust fund in favor of the TEL until paid to the TEL. Subject to the Act and the TEL Rules and Regulations, Retailer agrees: (i) to maintain for the purpose of this Retailer Contract a separate bank demand account in the name of the Retailer as "Trustee for the Tennessee Education Lottery Corporation", with a bank, acceptable to TEL, which is a member of an automated clearing house association (ACH); . . . (iii) to authorize the TEL to initiate Electronic Funds Transfer ("EFT") to and from that account for the net

*Lottery Corp. v. Cooper (In re Cooper)*, 430 B.R. 480, 497 (Bankr. E.D. Tenn. 2010). Without repeating the analysis set forth therein, this court agrees with *Cooper's* conclusion on this issue.[6] Because the express trust provides the factual foundation for a preexisting fiduciary relationship, the first element of a "defalcation while acting in a fiduciary capacity" is sufficiently established.

The court turns next to the second element of a defalcation in a fiduciary capacity, a breach of the fiduciary relationship. As noted above, the Sixth Circuit has found that breaches include a failure to account for or the misappropriation of trust funds. *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997). While deliberate wrongdoing is not required, a purely innocent or merely negligent failure to account will not suffice. *In re Patel*, 565 F.3d at 970 ("[T]here is no such thing as 'defalcation per se'"). Rather, "the debtor must have been objectively reckless in failing to properly account for or allocate funds." *Id.* A person is objectively reckless if he "acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer v. Brennan*, 511 U.S. 825, 836, 114

---

settlement amount due to the TEL from the sales of TEL lottery tickets; and (iv) that sufficient funds shall be available in the designated account on the dates specified by the TEL to cover the amounts due the TEL, as determined by TEL. Retailer shall be liable for the cost of TEL's legal fees, including but not limited to court costs, filing fees and lawyer's fees, in connection with any legal action brought by the TEL to recover past due amounts from Retailer.

[6] The *Cooper* decision followed a line of cases concluding that the failure to remit lottery proceeds was defalcation in a fiduciary capacity. *See Ga. Lottery Corp v. Thompson (In re Thompson)*, 296 B.R. 563, 566 (Bankr. M.D. Ga. 2003); *N.J. v. Kaczynski (In re Kaczynski)*, 188 B.R. 770, 776 (Bankr. D. N.J. 1995); *R.I. Lottery Comm'n v. Caltrone (In re Caltrone)*, 12 B.R. 60, 62 (Bankr. D.R.I. 1981). The statutes governing lottery ticket sales in these cases provided that retailers act as fiduciaries to the lottery and must hold proceeds in trust in segregated bank accounts. Other courts, when interpreting statutes that do not have such provisions, have found that debts arising from the failure to remit lottery ticket proceeds are dischargeable because no § 523(a)(4) fiduciary relationship existed. *See Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 340 (5th Cir. 1998) (no segregation of funds language); *N.C. Lottery Comm'n v. Wells (In re Wells)*, 431 B.R. 379, 384 (Bankr. E.D.N.C. 2009) (no trust language); *Div. of Special Revenue v. Schusterman (In re Schusterman)*, 108 B.R. 893, 900 (Bankr. D. Conn. 1989) (no trust language).

S. Ct. 1970 (1994) (quoting Restatement (Second) of Torts § 500 (1965)).[7] *See also Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 68, 127 S. Ct. 2201 (2007) (citing Prosser and Keeton § 34, at 213, "recklessness requires 'a known or obvious risk that was so great as to make it highly probable that harm would follow'"). Recklessness of this nature "should be determined from an objective examination of the actions of the parties in a particular set of circumstances." *Demjanjuk v. Petrovsky*, 10 F.3d 338, 349 (6th Cir. 1993).

The Plaintiff contends that the following facts are undisputed and establish the required recklessness. The defendant owned Holiday Market, a convenience store located in Elizabethton, Tennessee, which she acquired in July 2007. The store was managed by the Debtor's husband, Roy Little, with the Debtor having little, if any, involvement in the day-to-day operations, although she did attend retailer lottery training with her husband on July 25, 2007. As store manager, Mr. Little did not maintain a strict schedule, and the number of hours he worked in the store each day varied. Upon acquiring the store, the Littles did not hire new employees and instead retained those who had worked for the previous owners.

Under the Retailer Contract, the Plaintiff did not bill the Debtor for lottery tickets until they were activated. Packs of inactivated instant lottery tickets were stored in a locked cabinet at the market, such that access to the cabinet required a key, and activation of tickets required entry of a passcode into the lottery terminal. Both Mr. Little and the employee who was shift manager had access to the key and passcode. Initially, Chuck Belcher was the shift manager, but when his employment ended Wendy Chilton became shift manager.

Once lottery tickets were activated, the Plaintiff collected payment from the Debtor by

---

[7] As explained by the Sixth Circuit Court of Appeals:

> Recklessness may consist of either of two different types of conduct. . . . In [the second type], the actor has . . . knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.

*Demjanjuk v. Petrovsky*, 10 F.3d 338, 349 (6th Cir. 1993) (quoting Restatement (Second) of Torts § 500, comment (a)).

6

making regular, electronic sweeps from the trust account that the Debtor had set up pursuant to the parties' agreement. For lottery tickets sold from July 28 through November 10, 2007, the Plaintiff collected full payment from the Debtor. However, the Debtor "failed to maintain adequate balances on the electronic funds transfer bank account on November 17 and 24, 2007, and December 1 and 8, 2007." In other words, the Debtor's trust account did not include enough funds on these dates to pay the Plaintiff in full for all of the lottery tickets that had been activated. The deficiency balances from these four sweeps totaled $34,724.34.

At some point, presumably immediately prior to the first insufficient account balance date, the shift manager Wendy Chilton began calling Mr. Little on an almost daily basis asking to scan or order additional tickets. Additionally, Mr. Little observed that the invoice balances were indicating that an exceptionally large number of tickets were being sold. On Monday, November 19, after seeing one of the large balances, Mr. Little telephoned Ms. Chilton, advised her that there was a problem with the lottery amounts, and told her that he would meet with her the next morning at 6:00 a.m. at the beginning of her shift to discuss the matter. Ms. Chilton did not show up for work as scheduled, and Mr. Little was unable to reach her by phone. Mr. Little instructed another store employee to close the store for that day, and then the Littles left that day for "a long-planned bus tour vacation to NYC for Thanksgiving." The Littles then returned home on Sunday, November 25, 2007.

According to Mr. Little, during the week that he and the Debtor were out of town, Wendy Chilton quit her employment and Mr. Little instructed another employee to have the locks changed "as [he] was starting to suspect theft." Mr. Little stated that when he returned from vacation:

> I started investigating and found that three packs of tickets had been scratched and the winners [were] missing. I contacted a convenience store on the corner to see if they had any abnormal numbers of winners being cashed in by one person. I was informed that in fact they did and that it was Wendy [Chilton] cashing them in. I then called the police and reported the theft.

Based on police records, Mr. Little contacted the police on November 30, 2007. He also advised the Plaintiff of the situation. Wendy Chilton has never been located or charged. The Debtor did not have insurance or performance bonds that would cover employee theft, and she closed the convenience store at the end of 2007. In addition to the theft involving lottery tickets, there were

7

other internal theft problems at the store that occurred at earlier dates.

In addition to the foregoing undisputed facts, the Plaintiff further asserts that the Littles did not know the employees who worked at the market well, that no background checks were conducted, that the Debtor had no oversight procedures for ticket activation, and that she did not have a tracking system or accounting method to control the lottery tickets and their proceeds. The Plaintiff further alleges that it had tried to contact the Debtor by telephone when prior discrepancies were noted in the volume of ticket sales but had not been able to reach her or her husband.

The Debtor generally disputes these additional facts. Although Mr. Little testified in his deposition taken April 3, 2009, that no background checks were performed on employees, in his affidavit he states that he met with the previous owner three times in June and discussed the employees at length, and that he spent time at the store observing their work. As to the allegation regarding the lack of oversight procedures and a tracking method, Mr. Little states in his affidavit that each shift manually maintained the lottery log which included activations, tickets sold and tickets refunded. Regarding the Plaintiff's alleged inability to contact the Littles when previous discrepancies arose, Mr. Little states in his affidavit that he does not understand why the Plaintiff would not have been able to make contact because at all times he and his wife had three functioning phones with voicemail and missed call alerts, yet they had received no such calls or messages.

In response to the Plaintiff's assertion that the evidence establishes recklessness, the Debtor's first line of defense is that her lack of direct involvement in managing the store precludes a finding of defalcation by her personally. According to the Debtor, unless she was objectively reckless in allowing her husband to manage the store or unless she knew of material facts that led to the defalcation and took no steps to intervene, she is not liable. The court disagrees. The Debtor was contractually liable to the Plaintiff for any losses caused by her employees. The Debtor alone signed the contract with the Plaintiff, expressly agreeing to act as its fiduciary. The contract incorporated the Retailer Rules and Regulations, which required the Debtor to supervise the employees who sold lottery tickets and held her "fully responsible and liable for their conduct, as it relates to the sale of Tickets." Retailer Rules and Regulations § 2.04(C). In *Georgia Lottery Corp. v. Jackson (In re Jackson)*, 429 B.R. 365 (Bankr. N.D. Ga. 2010), the defendant similarly contended that he had no duty to preserve the lottery ticket proceeds because his store manager had the responsibility for the

8

day to day supervision of the store. The court rejected that proposition because, like those duties imposed by the Tennessee Retailer Rules and Regulations, the defendant's "duties under the Georgia Lottery Rules and Regulations explicitly include duties to supervise and control employees, and the Rules and Regulations state that the [d]efendant as a retailer, is responsible and liable for his employees' actions." *Id.* at 371. Accordingly, the court held that the defendant could not absolve himself from responsibility for the failure to account for lottery tickets proceeds simply because "his store was not under his control, but was under the control of his employee, the store manager." *Id.* Similarly, in the present case, the Debtor can not pled ignorance or lack of responsibility merely because her husband was the one managing the store. *Cf. BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1561 (6th Cir. 1992) (for purposes of nondischargeability, one partner's fraud may be imputed to other partner who had no knowledge of it).

The Debtor's alternative response is that a genuine issue of material fact exists as to the recklessness issue. The court agrees. The court is unable to determine from the record before it whether the Debtor, either acting directly or through her husband, was objectively reckless in failing to account for the lottery ticket proceeds. Recklessness is not established merely by the lack of insurance or performance bonds, as there is no indication that the Plaintiff required such coverage or that it is customary to insure against such losses in the convenience store business. As to the lack of background checks, there is no indication that Wendy Chilton, who is believed to be the dishonest employee, had a criminal record that would have been revealed if a more substantial investigation had taken place. Regarding the earlier thefts, it is unclear from the record how substantial these thefts were, and whether they were sufficient to place the Debtor (or her husband) on notice of the problems that led to the loss at issue herein. From what the court can glean, the thefts were not of lottery tickets (the record suggests missing money and cigarettes) and appear to have involved other employees, although Mr. Little stated in his deposition that "the problems with Wendy began essentially from the time [he] started the business." Whether these thefts were of a nature sufficient to alert the Debtor that she had a systemic oversight failure or that Wendy Chilton was dishonest, the court is unable to discern from the record.

The troublesome facts to this court pertain exactly to what, if any, monitoring procedures were in place to guard against employee theft of the lottery tickets. According to Mr. Little's

affidavit, there was a lottery log, signed and dated by the employee, that listed activations, tickets sold and tickets refunded, and there was a separate cash register for lottery sale receipts. Mr. Little stated that Wendy Chilton kept up with the ticket sales each day. However, it is not clear to the court whether Mr. Little performed any type of oversight to confirm that Ms. Chilton's logs were accurate, or the type of procedures that Mr. Little could have reasonably done to make this determination. The Debtor stated in her deposition that her husband kept up with the inventory of tickets coming in, but no details were given on how he did this, whether it was done on a consistent basis, or whether it was sufficient check on the employees' responsibilities.

Arguably, a failure to maintain sufficient oversight could be construed as negligence rather than recklessness. However, the court is unable to make this determination from the present record and must evaluate at trial the risks entailed by the way the lottery tickets were processed. Certainly, there were particular developments that, at a minimum, should have alerted Mr. Little and, consequently, the Debtor to the fact that an employee may have been stealing lottery tickets. Mr. Little stated in his deposition:

> Toward the end of the year, we were selling a lot of tickets. Wendy would call me almost daily and say, "We are out of tickets. Can I scan these in?" Or she would go ahead and scan them in, and she would say, "We need to order more tickets.". . . There were a couple of times that I had to re-order my weekly sweep ticket because it would disappear, things tended to, started to disappear, and there were several large, you know, sweeps of over a thousand dollars that started to be an issue. And I don't know what week it was, but I got a sweep for about twenty-four hundred-ish, it was over $2,000 that I had to go and get money from another fund to put in there, and I thought, this is not right, there is something, I mean, the lottery should at least be paying for itself. The week after that, I got a sweep for $4,000, and that's when I said "We've got a big problem." Because there weren't $4,000 in the lottery at all, it wasn't even close. So there were a couple of sweeps that went, the money wasn't in there. This one I had to get in there, but that's when, it's the first big time that I said, "We have a huge," and I am talking to Wendy at this point, "We got a huge problem. This is just a big problem." And that when I ordered some tickets and found out there were a lot of tickets ordered that I didn't know about. Well, this huge amount, I mean, when I talked to Valerie [employee of plaintiff] one time, she said, "Well you went through 21 packs in one week, and that's an enormous amount of tickets." And I said, "There is no way. We haven't sold that many. There is no way." Then the following week, I got a sweep for $9,000, and that's when everything fell apart, but on the $4,000 sweep, that when I called Wendy, I said, "We have a huge problem."

Deposition of Roy Little at pages 25-26.

10

From an objective viewpoint, when the "huge" discrepancies started showing up, combined with the fact that Wendy Chilton had recently been requesting more tickets, Mr. Little should have been alerted to the possibility of theft by Wendy Chilton, as she was the only employee other than him who had access to the locked cabinet and activation passcode. Particularly, by the morning of November 20 when she failed to show up and Mr. Little was unable to reach her by telephone, after having alerted her to the problem with lottery tickets, it would have been reasonable at that point to restrict her access to the lottery tickets until the issue was resolved.

In this regard, the record does suggest that some of losses could have been prevented if the Debtor through Mr. Little had acted more quickly. Mr. Little states in his affidavit that "the majority of the theft occurred during a two week period, including Thanksgiving Day" and that "most of the tickets were activated on Thanksgiving Day when the store was closed but prior to the locks being changed." However, it is not clear from the record the amount of the losses that would have taken place if Mr. Little had acted on November 20 or earlier when the large discrepancies began appearing.

Presumably, when Mr. Little stated that he telephoned Wendy Chilton on the $4,000 sweep, he was referring to the Monday, November 19 telephone call. However, neither this date nor the amount corresponds to the Retailer Incident Report dated December 6, 2007, which lists the following pertinent sweep dates and balances: 11/14/07 – $ 2,296.98; 11/20/07 – $9,324.94; 11/27/08 – $9,212.46; 12/04/07 – $16,585.75. Nor are these dates consistent with the dates of November 17 and 24 and December 1 and 8, 2007, when the Debtor failed to maintain adequate balances on her electronic funds transfer bank account. Of course, Mr. Little's deposition statement that he telephoned Wendy Chilton when the $4,000 sweep occurred could simply mean that he telephoned her when he learned of the sweep rather than when it actually took place. Nonetheless, the confusion in the record regarding dates causes the court to be unable to determine exactly when the Debtor knew or should have known of the problem with the exceptionally large ticket sales and the corresponding insufficient ticket proceeds from these sales. Adding to the confusion is that the record suggests that there was an invoice date and then a subsequent sweep date, with one comment indicating that these dates were two weeks apart with another stating that the dates were three weeks apart. Until a clearer picture is presented as to the timing of the lottery ticket system, with its

invoice dates and sweep payments dates, along with possible checks and balances to the system, the court is unable to determine when Wendy Chilton's alleged deceit could have been detected, when the first large insufficient funds sweep occurred, and what losses reasonably could have been prevented if the Debtor had reasonably acted in time.

Lastly, the court notes that Mr. Little states that "I do not feel that my actions were willful or negligent. . . . By the time I received the information and reports needed it was too late." However, the appropriate standard is not whether the Debtor (or her husband) was subjectively was at fault, but whether from an objective viewpoint, she "failed to act in the face of an unjustifiably high risk of harm that . . . [was] so obvious that it should [have] be[en] known." *Farmer v. Brennan*, 511 U.S. at 836. Because a genuine issue of material fact exists as to whether the Debtor's failure to account for the lottery ticket proceeds was objectively reckless, the second necessary element of a defalcation in a fiduciary capacity under § 523(a)(4) of the Bankruptcy Code, summary judgment in favor of the Plaintiff must be denied.

The third and final element of defalcation in a fiduciary capacity requires that the Plaintiff demonstrate that it suffered a loss due to the Debtor's breach of fiduciary duty. *Sangal v. Strickfaden (In re Strickfaden)*, 421 B.R. 802, 810 (Bankr. E.D. Mich. 2009). In her response to the Plaintiff's reply, the Debtor stipulates that the Plaintiff has suffered a loss in the amount of $34,724.34 resulting from the Debtor's failure to pay Plaintiff for the stolen lottery tickets. Consequently, there is no genuine issue of material fact as to this element.

IV.

Federal Rule of Civil Procedure 56, applicable in adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, provides that the court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding such a motion, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986)). In considering the motion, the court must construe all reasonable inferences in favor of the nonmoving party. *Spradlin v. Jarvis (In re Tri-City Turf Club,*

12

*Inc.)*, 323 F.3d 439, 442 (6th Cir.2003). Summary judgment is mandated "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

As for the present motion for summary judgment, two of the three required elements necessary to establish a nondischargeability claim under § 523(a)(4) for defalcation in a fiduciary capacity are present: a pre-existing fiduciary relationship and a loss. A genuine issue of material fact remains for trial as to whether the Debtor's failure to account for the lottery ticket proceeds was objectively reckless. Accordingly, the Plaintiff's motion for summary judgment must be denied. The court will enter an order to that effect.

# # #